# UNITED STATES DISTRICT COURT

for the

Southern District of California ▼

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
Meta Platforms, Inc., 1601 Willow Road, Menlo Park, CA,
Facebook usernames "MATTHEW.T.COLEMAN.5" and
"LOVEWATERSURF"

)
)
)
)
)
)

Case No.    '22  MJ1400

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the        NORTHERN        District of        CALIFORNIA        , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1119, 1111 | FOREIGN MURDER OF U.S. NATIONALS |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA JOSEPH P. HAMER, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

TELEPHONE
_____ *(specify reliable electronic means)*.

Date:    4/19/2022
_____

_____
*Judge's signature*

City and state:  SAN DIEGO, CA

MITCHELL D. DEMBIN, U.S. MAGISTRATE JUDGE
_____
*Printed name and title*

# AFFIDAVIT

I, Joseph P. Hamer, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 1, 2016.  As a federal agent, I am empowered by United States law to conduct investigations regarding, and make arrests for, offenses enumerated in Title 18 of the United States Code.  During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, executed search and arrest warrants, and seized evidence of federal criminal violations.  Since April 1, 2019, I have been assigned to work violent crimes against children at the FBI's Ventura Resident Agency.  In this role, I am responsible for, among other things, enforcing federal criminal statutes involving the sexual exploitation of children.  I have received both formal and informal training from the FBI regarding computer-related investigations and computer technology.  My formal law enforcement training includes 21 weeks of education at the FBI Academy, where I took classes on writing affidavits and providing evidentiary testimony, among other topics.  Prior to my assignment at the Ventura Resident Agency, I was assigned to the Los Angeles Violent Crime Task Force.  As a member of this task force, I investigated various violent crimes, including bank robbery, extortion, kidnapping, and homicide.

2.   This affidavit supports an application by the United

States of America for a search warrant for Meta Platforms, Inc., headquartered at 1601 Willow Road, Menlo Park, California 94025 ("Meta"), to search the following online accounts:

   a. Facebook username "MATTHEW.T.COLEMAN.5" ("SUBJECT ACCOUNT 1"), a personal Facebook account used by Matthew Coleman;

   b. Facebook username "LOVEWATERSURF" ("SUBJECT ACCOUNT 2"), a business account used by Matthew Coleman, collectively the ("SUBJECT ACCOUNTS") as described in Attachment A; for content and data from October 2018 to August 10, 2021, for items that constitute evidence of violations of federal criminal law, namely, Title 18, United States Code, Sections 1119 and 1111: Foreign Murder of United States Nationals (the "SUBJECT OFFENSE") as described in Attachment B. On September 8, 2021, a federal grand jury in the Southern District of California indicted M. COLEMAN for two counts of the SUBJECT OFFENSE.

   3.   The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every

fact that I or others have learned during this investigation.

## II. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    A.C. Reported M. COLEMAN Missing.**

4.    On August 9, 2021, Sgt. Larson of the Santa Barbara
Police Department ("SBPD") contacted FBI SA Jennifer Bannon
regarding a possible parental kidnapping.  Sgt. Larson provided
SA Bannon with a copy of a missing person police report that was
taken by the SBPD.  I reviewed the police report and learned the
following:

a.    On August 7, 2021, SBPD Officer Barriga spoke to
A.C. via telephone regarding her husband, M. COLEMAN.  A.C.
reported to SBPD that she, M. COLEMAN, and their two children,
R.C. (10 months old) and K.C. (two years old),[1] planned to go on
a camping trip.  Instead, A.C. said that M. COLEMAN had left
their home in Santa Barbara, California (the "Coleman
Residence") in the family's Mercedes Sprinter van with R.C. and
K.C.  A.C. reported that M. COLEMAN did not tell her where he
was going and was not answering her text messages. The officer
attempted to contact M. COLEMAN via telephone but received no
response.

b.    On August 8, 2021, A.C. called SBPD to follow up
on the previous day's report.  SBPD Officer Michael Chung
responded to the Coleman Residence and met with A.C., who
requested SBPD's assistance in reporting M. COLEMAN and their

---

[1] According to R.C.'s birth certificate, she was born in
September 2020.  According to K.C.'s birth certificate, he was
born in October 2018.  Both were born in the United States and
were U.S. citizens.  The time period requested under the warrant
to search the SUBJECT ACCOUNTS begins the month of K.C.'s birth.

two children missing.  Officer Chung asked A.C. whether she
could attempt to use the "Find My iPhone" application to locate
M. COLEMAN's phone.  A.C. agreed and turned on a laptop, which
showed that M. COLEMAN's last known location was in Rosarito,
Baja California, Mexico at approximately 2:24 p.m.

### B.  M. COLEMAN Is Located Returning from Mexico and R.C.'s and K.C.'s Bodies Are Found.

5.  On August 9, 2021, at about 11:50 a.m., Sgt. Larson,
SBPD Detective Davis, and District Attorney Investigator (DAI)
Aijian, went to the Coleman Residence where they met A.C.'s
friends, T.C. and A.P., who explained that A.C. had just left
for San Diego.  T.C. and A.P. showed how they were using the
Find My iPhone app on a MacBook Pro computer (the "MacBook") to
track M. COLEMAN's iPhone movements in Mexico toward the San
Ysidro Port of Entry ("SYPOE").[2]

6.  A.P. and T.C. asked for help coordinating the search
for M. COLEMAN, R.C., and K.C.  A.P. and T.C. showed Det. Davis
and DAI Ajian a text message from M. COLEMAN's iCloud account on
the MacBook.  The text message from M. COLEMAN to A.C. was sent
on August 9, at 3:12 a.m., stating: "Hi babe, miss you too.
Things have been rough but starting to get some clarity as well.
Still confused on a lot of things though and processing through
them. So many crazy thoughts going through my head right now,

---

[2] According to Det. Davis's report, A.P. identified the
MacBook as belonging to M. COLEMAN and said A.C. was able to log
in because she had his password.  Later, A.P. provided the FBI
with text messages between her and A.C.  These text messages,
which were on August 9 between about 1:23 p.m. and 2:33 p.m.,
show A.C. providing A.P. with M. COLEMAN's iCloud login and
password, and A.C. asking for "any updates on Matt's location"
with A.P. responding, "It looks like he is at the border."

hard to explain. Yeah, funny your getting some clarity through my grandmas old bibles. Wasn't there 2? Anyways, was actually still thinking of burning them in case theres a chip in them or something. Going to keep processing through everything and hope to get some answers. Hope all this craziness ends soon. Love you."

7.    A.P. and T.C. also showed Det. Davis and DAI Aijian responsive text messages from A.C. to M. COLEMAN asking if her children were okay, as well as a message from A.C. to M. COLEMAN on August 9 at 9:24 a.m., stating: "We are doing this together babe.  Praying for clarity over you and your mind this morning. Everything you've believed and known to be true is happening right now.  I'm partnering with you from SB.  Let's take back our city.  The gateway of revival for the state of California and the nation and the world.  You were created to change the course of world history.  Take care of my little giant slayer and my the voice of heaven's dove.  They sure are special."

8.    Sgt. Larson thereafter seized the MacBook, and law enforcement obtained search warrants for the MacBook.

9.    At approximately 1:00 p.m., on August 9, M. COLEMAN arrived at the SYPOE in the Mercedes Sprinter van.  M. COLEMAN was referred to Secondary Inspection.  There were no other occupants in the Mercedes Sprinter van.  Federal agents took custody of the Mercedes Sprinter van.  That same day, a Mexican liaison partner with the Secretaria de Seguridad Publica Municipal de Rosarito relayed to FBI Supervisory Special Agent Joyce Deniz that they had located two deceased children matching

R.C.'s and K.C.'s descriptions in a ditch at approximately 8:00 a.m. on August 9.

10.   Later that day, M. COLEMAN was interviewed by FBI SA Nathaniel Dingle, during which time SA Dingle read M. COLEMAN his Miranda rights and M. COLEMAN waived his rights and agreed to speak with agents.  I reviewed the video recorded interview during which time M. COLEMAN made, among others, the following statements:

a.     M. COLEMAN confessed to killing his children, R.C. and K.C.  M. COLEMAN said that he drove his children to Mexico on Saturday, August 7, 2021.  M. COLEMAN said that he believed his children were going to grow into monsters so he had to kill them.  At approximately 5:00 a.m., on August 9, M. COLEMAN drove south on Descanso Road.  He pulled off to the side of a road in the area of Rancho Del Cielo.  M. COLEMAN stated that first he killed R.C., using a spear fishing gun that pierced R.C. in the heart.  After he killed his children, M. COLEMAN said that he moved their bodies approximately 30 yards away and placed them in some brush.[3]  M. COLEMAN stated that he drove a couple of miles where he then discarded the spear fishing gun and bloody clothes near a creek.  He threw bloody clothes into a blue trash bin somewhere off the side of a road in Tijuana, Mexico.

---

[3] M. COLEMAN provided agents with the approximate location of the bodies, which coincided with where the bodies were located by Mexican authorities.

b.      M. COLEMAN said that five or six days ago he started noticing strange coincidences.  He discussed QAnon[4] and Illuminati conspiracy theories as well as Strong's numbers (an index of every word in the Bible).  He said visions and signs revealed that his wife, A.C., possessed serpent DNA (M. COLEMAN mentioned that he was not sure if his wife was a shape shifter) and had passed it onto his children and that all things were pointing to the idea that his children have corrupted DNA that will spread if something is not done about it.  M. COLEMAN explained that he was either crazy or the only person that is left on Earth that is a true man, and that while he was in Mexico – before killing his children – M. COLEMAN laid in bed seeing all the pieces being decoded like "The Matrix," and he was Neo.[5]  M. COLEMAN also discussed time travel, teleportation, R.C. and K.C. telling him about babies being placed in fireworks, food, and walls.  M. COLEMAN explained that his children were communicating with him; that K.C. told him that A.C. and a family friend were abusing K.C. and R.C.; and that eventually M. COLEMAN saw the big picture that he had to kill his children to prevent them from becoming an alien species that would release carnage over the Earth.[6]

_____

[4] M. COLEMAN mentioned during the interview that "Q" was actually talking to him.

[5] "The Matrix" is a science fiction film. Neo is the lead character.

[6] On August 10, 2021, while I was transporting M. COLEMAN to the Santa Ana jail, M. COLEMAN discussed his religious beliefs, work as a pastor, and the biblical story of Abraham sacrificing his son Isaac as well as Nephilim.  On August 12, 2021, FBI
*(footnote cont'd on next page)*

c.      During the interview, M. COLEMAN showed the interviewing agents several hand signals or signs that M. COLEMAN said were an indication that someone was a part of the conspiracy and showing their allegiance.  M. COLEMAN then explained that he scrolled through Instagram and took screenshots of individuals making these hand signals or signs. M. COLEMAN explained that he does not use Facebook anymore, but had recently searched through his friend, A.M.'s, Facebook account and saw a posted photograph of A.M. making one of the gestures over his eye.  M. COLEMAN showed agents the hand gesture.  According to M. COLEMAN, after seeing A.M.'s posting with the hand gesture, M. COLEMAN knew that the "whole thing was a setup" and "they" were using people to get to M. COLEMAN.

d.      M. COLEMAN identified and initialed photographs of R.C.'s and K.C.'s dead bodies as his children.

e.      M. COLEMAN said he knew what he did was wrong, but it was the only course of action that would save the world.

f.      M. COLEMAN signed a consent form allowing the FBI to search his iPhone and provided the passcode.

### C.    A.C. is Interviewed at SYPOE.

11.   On August 9, 2021, after M. COLEMAN had entered the SYPOE without his children, FBI SA Zachary Schaefer and Jesse Chappell conducted a Mirandized interviewed of A.C.  I reviewed the recording of that interview and observed the following:

---

agents interviewed A.P., a friend of M. COLEMAN's and A.C.'s. A.P. explained that M. COLEMAN was very spiritual and claimed he knew what God was saying, however, M. COLEMAN had a hard time sharing what was in his head and had to dumb down his visions and dreams for others.

a.     A.C. explained that she and her husband were researching QAnon, and M. COLEMAN became significantly more paranoid that people around him were involved in a conspiracy. A.C. said that M. COLEMAN started doing a lot of research on leaders running "the church" and found that they may have been part of the conspiracy.  A.C. explained that M. COLEMAN began seeing "signs" in people's social media posts, and M. COLEMAN believed he was able to connect the people running "the church" to people in their community and to some of their best friends. A.C. said that M. COLEMAN found information on their friends' Instagram accounts that M. COLEMAN believed showed that they were "all in on this thing together."  M. COLEMAN even accused A.C. of being a part of the conspiracy.[7]

**D.   M. COLEMAN's Comments on Social Media.**

12.   On August 10, 2021, while M. COLEMAN was being transported from the SYPOE to the Santa Ana jail, M. COLEMAN told me and SA Bannon that he started to believe everyone around him was against him, including his friend, A.M.  M. COLEMAN said he knew A.M. was "in on it" because he saw an Instagram photo of A.M. making signs with his hands.

13.   Additionally, on August 10, 2021, while SA Bannon and I were transporting M. COLEMAN to the Ventura County jail, M. COLEMAN said that about five days before he left for Mexico, he started to get clarity.  M. COLEMAN said he saw messages on

---

[7] A.C. stated during the interview that M. COLEMAN was identifying signs on Instagram and not Facebook, but as further described in the affidavit, M. COLEMAN and others shared Facebook links to various articles, and M. COLEMAN mentioned identifying a friend exhibiting a sign on Facebook.

Instagram that were showing hand signs, proving "they" were targeting M. COLEMAN, and M. COLEMAN began to understand what those messages meant.

**E.    Interview of M. COLEMAN's Friend, A.M.**

14.   On August 20, 2021, M. COLEMAN's friend A.M., was interviewed by SA Bannon and me.  During the interview, A.M., told us the following:

a.    M. COLEMAN started noticing "signs" everywhere, including postings on Instagram from musicians, teachers, and his friends.  M. COLEMAN took notice of symbols he saw in photographs.  Approximately three weeks before M. COLEMAN left for Mexico, M. COLEMAN started asking A.M. about these photographs and the hand gestures and symbols depicted in the photographs.  M. COLEMAN stated the people in the photographs making these signs were evil, disguised as good, therefore these people were "compromised."  A.M. also said that on August 5, 2021, two days prior to M. COLEMAN taking his children to Mexico, M. COLEMAN began showing A.M screen shots from Instagram of A.M.'s closest friends making hand gestures such as peace signs.  M. COLEMAN accused A.M. of being a "loyalist," which was why A.M. could not see that he was being controlled.

b.    Within hours of M. COLEMAN taking his children to Mexico, A.C. called A.M., and A.M. went to the Coleman Residence.  A.C. showed A.M. a Facebook photograph of A.M and his friends when A.M. was approximately 13 years old (making the photograph over 10 years old).  The photograph depicted A.M. and his friends making hand gestures.  Based, at least in part, on

these hand gestures, A.M. said that A.C. accused him of "being in on it" and eventually A.C. chased A.M. out of the Coleman Residence.

### F. Identification of the SUBJECT ACCOUNTS.

15.     After M. COLEMAN's arrest, FBI personnel conducted an open-source search through the Internet for Facebook and Instagram and located the SUBJECT ACCOUNTS.  SUBJECT ACCOUNT 1 was positively identified by matching the name "Matthew Taylor Coleman" and the profile photograph which shows a picture of M. COLEMAN.  SUBECT ACCOUNT 2 was positively identified by matching the name of COLEMAN's business, LoveWater Surf.[8]  Investigators sent letters to Meta on August 9, 2021 (for SUBJECT ACCOUNT 1) and August 12, 2021 (for SUBJECT ACCOUNT 2) requesting it preserve the account contents.  Those requests lapsed on January

---

[8] Law enforcement agents and officers investigating this case learned the name of M. COLEMAN's business during their interviews and investigation.  Agents have interviewed several of M. COLEMAN's employees at Lovewater Surf who indicated M. COLEMAN owned the business.  Additionally, the public profile portion of SUBJECT ACCOUNT 1 states that M. COLEMAN is the "Founder at Loverwater Surf School." I believe M. COLEMAN exclusively or primarily operated SUBJECT ACCOUNT 2, because 1) the business is a relatively small surfing school, and several employees were temporary or seasonal, 2) none of the employees that agents have interviewed described their duties as marketing or managing social media accounts, 3) in reviewing M. COLEMAN's digital devices, agents have not found any communications with, or indication he employs, a social media manager or marketing arm, 4) M. COLEMAN appeared to control other digital platforms used as part of the business, including FareHarbor (a business management software platform that M. COLEMAN accessed from his digital devices and which was used to run all aspects of the business) and the business' Instagram account (his iPhone had several Instagram direct messages to and from that account), and 5) his digital devices contained several photos, videos, and URLs related to the business.

6 and 9, 2022, respectively.  On January 25, 2022, investigators sent a new letter to Meta requesting it preserve the contents of the SUBJECT ACCOUNTS.  That request remains in place.[9]

16.    During my review of M. COLEMAN's iPhone and the MacBook, I saw at least 11 text-message exchanges between M. COLEMAN and others in which Facebook links were shared.[10]

a.    For example, on June 19, 2020, M. COLEMAN's friend, A.M., sent a Facebook link to M. COLEMAN showing a video screenshot of former President Donald Trump being interviewed, along with writing that says, "Team Trump Online," "Aliens?," and "Triggered Presidential Edition Text Trump to 88022."

b.    Additionally on December 3, 2020, A.M. sent M. COLEMAN a Facebook link to a video entitled, "Our Favorite

---

[9] On February 17, 2022, United States Magistrate Judge Andrew Schopler issued a search warrant for the SUBJECT ACCOUNTS (22MJ648) The affidavit submitted to obtain that warrant incorrectly said preservation requests had been in place since August 2021 and did not state that the original preservation requests lapsed for a period in January 2022. This affidavit is submitted to correct paragraph 15.  On April 13, 2022, Meta provided data in response to 22MJ648, and agents skimmed through some of the material but did not conduct a thorough review and have not separated out any material as responsive to the warrant.  Agents ceased further review until this affidavit could be submitted and a new warrant obtained.  I ask the court not to rely on anything that agents may have seen in the material in deciding if there is probable cause for the requested warrant.  If issued, agents will submit the new warrant to Meta and request that it provide the requested data anew.

[10] On January 15, 2021, M. COLEMAN's friend, J.R. sent a text message to M. COLEMAN that said J.R. was going to send something to M. COLEMAN on "FB messenger."  I know that this refers to Facebook's messaging service. M. COLEMAN responded by writing, "I don't have FB messenger.  No Facebook on phone right now.  Telegram is a pretty rad alternative."

Election Tampering Witness Still Refuses to be Bullied by Rep. Steve Johnson."

### III. **TRAINING AND EXPERIENCE REGARDNG INDIVIDUALS WHO COMMIT VIOLENT CRIMES AND THE USE OF SOCIAL MEDIA BY THOSE WHO BELIEVE IN OR PARTICIPATE IN CONSPIRACY THEORIES.**

17.    Based on my training and experience and my discussions with other law enforcement personnel, I know that some people who are arrested for violent crimes will feign mental illness (i.e., engage in malingering behavior) whereas others may suffer from legitimate mental illness.  One way to determine if a person has a legitimate mental illness or is malingering, or to determine the extent to which a person understood the nature of their actions, is to examine their conduct and communications with others in the time around and leading up to specific events.  For that reason, I believe an examination of M. COLEMAN's social media content and communications will help establish his true mental state leading up to and around the time of the murders, as well as his mental state in relation to R.C., K.C., and A.C.

18.    Additionally, based on my training and experience and my discussions with other law enforcement personnel, I know that people who participate in and believe in conspiracy theories, such as QAnon or Illuminati, will often find like-minded individuals through online groups that are hosted on various social media platforms like Facebook, Instagram, and Twitter.  I also know, based on my training and experience and discussions with other law enforcement personnel, that individuals who participate in and believe in conspiracy

theories, such as QAnon or Illuminati, will often communicate with other like-minded individuals on social media platforms such as Facebook, Instagram, and Twitter as well as through encrypted chat platforms such as WhatsApp, Signal, and Telegram.

## IV. TRAINING AND EXPERIENCE REGARDING FACEBOOK/META

19.  Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

20.  Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

21.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information

about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

22.  Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

23.  Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall,"

which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

24.   Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

25.   Facebook users can use Facebook Messenger to communicate with other users via text, voice, or video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

26.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

28.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

31.  In addition to the features described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

32.  Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP addresses used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

33.  Meta retains location information associated with Facebook users under some circumstances, such as if a user

enables "Location History," "checks-in" to an event, or tags a post with a location.

34.   Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

### V.  PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

35.   Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Meta are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Meta for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta.  The impact on Meta's business would be disruptive and severe.

36.   Therefore, in order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta, to protect the privacy of Meta's subscribers

whose accounts are not authorized to be searched, and to effectively pursue this investigation, the FBI seeks authorization to allow Meta to make a digital copy of the entire contents of the SUBJECT ACCOUNTS. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

37. Analyzing the data to be provided by Meta may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications, which files may be attachments, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases

dramatically.  Internet Service Providers also do not always organize the electronic files they provide chronologically, which makes review more time consuming and may require the examiner to review each page or record for responsive material.

38.  Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within 90 days of receipt of the data from the service provider, absent further application to this court.

39.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages that identify any users of the subject account(s) and any electronic messages sent or received in temporal proximity to relevant electronic messages that provide context to the relevant messages.

40.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VI. **CONCLUSION**

41. Based on the foregoing, I request that the Court issue the proposed search warrant.

42. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

JOSEPH R. HAMER
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on April __19__, 2022.

MITCHELL D. DEMBIN
United States Magistrate Judge

## ATTACHMENT A

Meta Platforms, Inc. (Meta) is an Internet Service Provider headquartered at 1601 Willow Road, Menlo Park, California 94025. Meta hosts the following electronic communication accounts that are the subject of this search warrant and application: (1) Facebook username "MATTHEW.T.COLEMAN.5" ("SUBJECT ACCOUNT 1"), and (2) Facebook username "LOVEWATERSURF" ("SUBJECT ACCOUNT 2").

**ATTACHMENT B**

**I.** Service of Warrant

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.** Items to be provided by the ISP

For Facebook usernames or user IDs "MATTHEW.T.COLEMAN.5" ("SUBJECT ACCOUNT 1") and "LOVEWATERSURF" ("SUBJECT ACCOUNT 2"), collectively the SUBJECT ACCOUNTS:

(a) All contact and personal identifying information for the SUBJECT ACCOUNTS, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b) All activity logs for the accounts and all other documents showing the user's posts and other Facebook activities from October 2018 to August 10, 2021;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from October 2018 to August 10, 2021, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device

identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from October 2018 to August 10, 2021, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from October 2018 to August 10, 2021;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(q)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**III.** Search of the data

The search of the data supplied by Meta pursuant to this warrant will be conducted by the FBI and any government personnel working with the FBI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of October 2018 to August 10, 2021, and to the seizure of data, communications, records, or information:

a) tending to show M. COLEMAN's, A.C.'s, R.C.'s, or K.C.'s travel inside or outside of the United States;

b) tending to indicate M. COLEMAN's state of mind, competency, or coherence in relation to A.C., R.C., K.C., and the SUBJECT OFFENSE;

c) tending to indicate motive for or a plan to commit the SUBJECT OFFENSE or conceal the commission of the SUBJECT OFFENSE;

d) tending to indicate interest in QAnon or Illuminati;

e) about the use, purchase, or acquisition of a spear fishing gun; and

f) tending to identify the user(s) of SUBJECT ACCOUNT 1 or SUBJECT ACCOUNT 2;

which is evidence of violations of Title 18, United States Code, Sections 1119 and 1111, foreign murder of U.S. nationals ("SUBJECT OFFENSE").